**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

SHERRI JO REID, d/b/a COLONIAL
SQUARE TAX AND ACCOUNTING,

          Plaintiff,

vs.

PEKIN INSURANCE COMPANY,

          Defendant/Third-Party
          Plaintiff,

vs.

STEVE KLOCKE and KATHY
KLOCKE,

          Third-Party Defendants.

No. 04-CV-1030-LRR

**ORDER REGARDING MOTION FOR
PARTIAL SUMMARY JUDGMENT**

———————————

**TABLE OF CONTENTS**

**I.**    **PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

**II.**   **JURISDICTION**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

**III.**  **UNDISPUTED MATERIAL FACTS**  . . . . . . . . . . . . . . . . . . . . . . . . . *3*
     **A.**    **The Building**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
     **B.**    **The Pekin Insurance Policy**  . . . . . . . . . . . . . . . . . . . . . . . . . *4*
     **C.**    **Klocke's Demolition Activities**  . . . . . . . . . . . . . . . . . . . . . . . *5*
     **D.**    **Reid's Claims and Observations**  . . . . . . . . . . . . . . . . . . . . . . . *5*
     **E.**    **The Local Contractors**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
          **1.**    **McDivitt**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
          **2.**    **Till** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
          **3.**    **Carlson** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
     **F.**    **The Initial Inspections**  . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
          **1.**    **Balmer's Report**  . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*

       2.     *Teasdale's Report* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
       3.     *Sandberg & Riley* . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
  **G.**     *Pekin's Partial Denial of Reid's Claim* . . . . . . . . . . . . . . **10**
  **H.**     *Inspections After Pekin's Partial Denial of Claim* . . . . . . . . . . . **12**
       1.     *Balmer & Waugh's Report* . . . . . . . . . . . . . . . . . . . . . . **12**
       2.     *Sandberg & Riley* . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
       3.     *Walsh & Kuchma's Report and Supplemental Report* . . . . . . **13**
       4.     *Teasdale's Second Report* . . . . . . . . . . . . . . . . . . . . . . **14**
       5.     *Ashton's Report* . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

**IV.**    *STANDARD FOR SUMMARY JUDGMENT* . . . . . . . . . . . . . . . . . . . . . **14**

**V.**     *ANALYSIS OF REID'S BAD FAITH CLAIM* . . . . . . . . . . . . . . . . . . . **15**
  **A.**     *Elements of a Bad Faith Claim* . . . . . . . . . . . . . . . . . . . . . . . **16**
  **B.**     *Reid's Claim was "Fairly Debatable"* . . . . . . . . . . . . . . . . . . . . **17**
       1.     *The parties' arguments* . . . . . . . . . . . . . . . . . . . . . . . . **17**
       2.     *June 20, 2003 partial claim denial* . . . . . . . . . . . . . . . . . **18**
       3.     *Continued denial of claim* . . . . . . . . . . . . . . . . . . . . . . **19**

**VI. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

The matter before the court is Pekin Insurance Company's Motion for Partial Summary Judgment ("Motion") (docket no. 20).

## I. PROCEDURAL HISTORY

On July 16, 2004, Plaintiff Sherri Jo Reid ("Reid"), d/b/a Colonial Square Tax and Accounting, filed a Complaint alleging breach of contract and bad faith against Pekin Insurance Company ("Pekin"). On August 27, 2004, Pekin filed an Answer. On September 7, 2004, Pekin filed a Third-Party Complaint against Steve and Kathy Klocke seeking indemnification. On September 24, 2004, the Klockes filed an Answer and Jury Demand.

On January 16, 2006, Pekin filed the instant Motion. Pekin seeks partial summary judgment, that is, summary judgment on Count II of the Complaint, the bad faith allegation. On February 7, 2006, Reid filed a Resistance to Motion for Partial Summary Judgment ("Resistance"). On February 13, 2006, Pekin filed a Reply.

## II. JURISDICTION

In the Complaint, Reid alleges diversity jurisdiction pursuant to 28 U.S.C. § 1332. Reid is an Iowa resident who operates her business in Jackson County, Iowa. Pekin is an Illinois Corporation that is authorized to conduct business in the State of Iowa. The Klockes are Iowa residents. The amount in controversy exceeds $75,000. The court finds there is diversity jurisdiction pursuant to 28 U.S.C. § 1332. *See Caterpillar Inc. v. Lewis*, 519 U.S. 61, 66 n.1 (1996) (construing 28 U.S.C. § 1332(a) to find a requirement of complete diversity between opposing parties and noting that "unless plaintiff chooses to amend his complaint to assert a claim against third-party defendant, plaintiff and third-party defendant are simply not adverse, and there need be no basis of jurisdiction between them").

## III. UNDISPUTED MATERIAL FACTS

### A. The Building

Reid owns the Colonial Square Building ("Building"), a commercial building, which is located at 1000 East Platt Street in Maquoketa, Iowa. The Building was built in 1968, and Reid purchased it in 1987. The Building was originally built of concrete masonry units (or "CMUs") and the roof consisted of a flat, steel-framed roof. When Reid purchased the Building, she conducted extensive renovations. She added a wooden hip roof frame above the pre-existing flat roof. The new roof was built with manufactured gable trusses. She operates her business, Colonial Square Tax and Accounting, out of the Building.

Prior to September 2002, Reid hired two local professional contractors, Larry McDivitt and Kenneth Till, to examine the brick fascia on the front of the building. Reid wanted to repair cracks in the brick fascia. McDivitt and Till independently observed three hairline cracks in the south wall of the Building. They believed the rest of the wall was in "good" condition.

### B. The Pekin Insurance Policy

Pekin insured the Building through Policy Number BU11278-N ("the Policy"), a "Businessowners Policy," from September 5, 2002 through September 5, 2003. The Policy provides that the "Replacement Cost" of the Building is covered and the "Limit of Insurance" is listed at $323,500. The Policy includes a "Businessowners Special Property Coverage Form." In that form, the Policy provides the following:

> **A. Coverage**
> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

The Policy also provides for certain exclusions:

> We will not pay for loss or damage caused by or resulting from . . . (1) Wear and tear; (2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself; . . . (4) Settling, cracking, shrinking or expansion . . . .
>
> We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage. . . . **Negligent Work**: Faulty, inadequate or defective: (1) Planning, zoning, development, surveying, siting; (2) Design, specifications, workmanship, repair, constructions, renovation, re-modeling, grading, compaction;

4

(3) Materials used in repair, construction, renovation or
remodeling; or (4) Maintenance; of part or all of any property
on or off the described premises.

(Emphasis in original).

### C. Klocke's Demolition Activities

On October 25, 2002, Steve Klocke of Klocke Excavation Company, used a Caterpillar EL-200B Track Excavator to remove a foundation wall on a property approximately four feet east of Reid's Building. He repeatedly smashed the excavator's bucket against the foundation to crack the cement.

Reid and others heard and felt the vibrations of Klocke's demolition activities. Reid believed the Building sustained substantial damage due to Klocke's demolition activities on the adjacent property.

### D. Reid's Claims and Observations

At the time of the October 25, 2002 demolition activities, Klocke carried liability insurance with Westbend Mutual Insurance Company ("Westbend"). In October of 2002, Reid notified Westbend of a potential claim and Don McDonald, a Pekin agent, of the incident. Reid did not, however, file a claim with Pekin at that time. At some point prior to May of 2003, Westbend denied Reid's claim.

Due to Westbend's denial, in May of 2003, Reid submitted an insurance claim to Pekin alleging the Building sustained substantial damage due to Klocke's October 25, 2002 demolition activities. Reid claimed the damage included structural damage to the Building's foundation, damage to the roof structures and roof trusses, cracking of the outside concrete blocks, cracking in the brick fascia, minor cracking in the interior of the Building, as well as electrical wiring problems and ductwork problems. Reid prepared four pages of type-written notes regarding her claim and the remedy she expected ("Reid's

Notes"). Thomas Messer, a Pekin Property Specialist, oversaw and supervised Reid's claim.

## E. The Local Contractors[1]

### 1. McDivitt

Shortly after the October 25, 2002 demolition activities, Reid asked Larry McDivitt, one of the local contractors who had examined the hairline cracks on the Building's front (south) wall prior to September of 2002, to examine the south wall of the Building again. McDivitt observed

> a large number of cracks across the entire length of the [south] wall. A quantity of individual blocks were cracked in two, plus a large number of long vertical cracks existed in the wall. There now was a good sized crack which was also bulged out under the porch roof.

On July 9, 2003, in a written statement, McDivitt made the following conclusion:

> It is my professional opinion as an experienced professional contractor that these new cracks were caused by the vibration incident the [Building] experienced on October 25, 2002.

### 2. Till

On June 16, 2003, Kenneth Till, the other local contractor who had examined the hairline cracks on the Building's south wall prior to September of 2002, wrote about his knowledge of the Building. Like McDivitt, Till examined the building just after October 25, 2002, and he came to the same conclusion as McDivitt. Additionally, Till stated wood rafter braces were "knocked down." Till stated the following:

> I examined the cracks in the doorway in the interior of the building. I know for a fact that these did not exist before

---

[1] Pekin admits having received the statements of the three local contractors, but the record is unclear as to *when* Pekin received the statements.

October 25, 2002. It also appeared to me because of the movement of the fiberglass tape in the joint corner, that the wall had been moved about a quarter of an inch.

### 3. Carlson

On July 10, 2003, Donald Carlson, an electrician, signed a statement that Reid had called him to the Building in February of 2003. Carlson stated that he responded to a call that there had been a fire in one of the recessed lights in the building. Carlson wrote:

When I opened up the light I found that the twist cap had been popped off the wiring, and the wiring to the balast had arced causing the fire. The light was a total loss and had to be replaced. The only thing that could have popped off the wiring cap and caused the wires to separate was strong vibration.

### F. The Initial Inspections

### 1. Balmer's Report

In May of 2003, Reid retained the services of Ronald A. Balmer, a professional engineer employed by IIW Engineers & Surveyors, P.C., of Dubuque, Iowa, to inspect the Building. On May 7, 2003, after being advised of Klocke's demolition activities in October of 2002, Balmer performed an on-site inspection of the Building. On May 16, 2003, Balmer issued a written report ("Balmer's Report") setting forth the findings of his May 7, 2003 inspection. Balmer's Report, in part, provides:

A somewhat random pattern of cracking was observed in the concrete block substrate throughout the exterior walls of the building. . . . The frequency and orientation of the cracks is consistent with naturally occurring shrinkage of the concrete block masonry. . . . We did not observe any significant diagonal cracks in the block that would have been indicative of foundation support loss. . . .

7

In our opinion, the block cracks we observed pre-existed the vibration event of October 2002. The typical shrinkage cracks are a natural and expected characteristic of concrete block construction that do not significantly reduce the structural integrity of the walls. . . .

We did not observe an effective flashing at the top of the brick to prevent water from entering the system from above. In our opinion swelling of the plywood joints with moisture entry, and the discontinuity of the substrate at the plywood joints, are the primary causes of the cracking. . . . It appears to us that the overall assembly of the window area; including the rough opening preparation and lack of protection, lack of flashing at the window sill or along the top of the brick soap wainscot, and lack of effective sealants; resulted in significant water infiltration and deterioration of the substrate materials. . . .

It was reported that during the vibration event of October 2002 lumber roof framing components were heard falling on the original metal roof deck. . . . In our opinion it is unlikely that the vibration event of October 2002 would have dislodged these components if they had been properly fastened when the system was erected. . . .

The interior wall at approximately mid-depth of the overall building had some significant cracks at the corridor door head. . . . In our opinion this particular door head fits the profile of an area of high stress and thus we find it very likely that the cracks observed at this location were due to vibration from the October 2002 event. . . .

In several offices along the east wall of the building cracks were observed in paint finish at the corners, typically at the upper reaches of the wall. It is our understanding that these rooms were remodeled and finished soon after [Reid's] acquisition of the property 15 years ago. . . . In our opinion the vibration event of October 2002 . . . was sufficient to disturb and crack the relatively brittle paint on the flexible, marginally supported, tape substrate.

Balmer estimated that the repairs to the damage caused to the Building due to Klocke's October 25, 2002 demolition activities would range in the hundreds of dollars, rather than thousands of dollars.

### 2.    *Teasdale's Report*

Westbend hired David L. Teasdale, a professional engineer employed by Haag Engineering Company, to inspect Reid's property.  On June 3, 2003, Teasdale met with Reid and obtained background information regarding the Building, the October 25, 2002 demolition activities and her reports of damage.  Teasdale then performed an onsite inspection of the Building.

Teasdale did not write a report on his inspection until after Pekin initially denied Reid's claim in part.  On August 14, 2003, Teasdale summarized his inspection in a ten-page report ("Teasdale's Report").  Teasdale, in part, wrote the following:

> Based on our inspection and the information discussed above, we make the following observations and have reached the following conclusions: . . .
>
> 3.    Vibrations alarmed the occupants but caused no damage to drywall finishes or the building structure.
>
> 4.    Conditions which concerned the owner were normal construction irregularities and cracks/separations typical for this type of construction.  While the vibration event may have called the owner's attention to these conditions, it did not create them.

### 3.    *Sandberg & Riley*

Pekin hired Robert Sandberg[2] of Classic Consultants, Ltd., and John Riley, a professional engineer from Riley Engineering, to inspect the Building.  On June 9, 2003,

---

[2] Prior to becoming an independent consultant, Sandberg worked for Pekin from about 1993 to 2000 as a property specialist.

Sandberg and Riley performed an onsite inspection of the Building. Reid provided Sandberg with two documents that day: (1) a copy of Balmer's Report and (2) Reid's Notes.

Sandberg did not walk up into the attic of the Building, but, rather, peered up into the attic through a hole in the ceiling. He interviewed neither the people who were inside the Building on October 25, 2002, nor the local contractors who had observed the building prior to that date. After a three-hour inspection, Sandberg and Riley concluded that there was no evidence of any damage to the Building from Klocke's demolition activities.

In a two-page report dated July 10, 2003 ("Riley's July Report"), Riley conveyed his conclusions about the inspection of the Building to Sandberg. Riley concluded:

> It is my opinion that the observed cracks are normal and consistent with nonreinforced hollow core concrete block masonry construction and that said cracks pre-date the October 2002 demolition event. . . .
>
> It is my opinion that none of the interior gypsum wallboard cracks and none of the ceiling tile damage should be attributed to the October 2002 event. . . . In any case, the cracks may be considered non-structural and repaired as for any other cosmetic flaw.

### G. Pekin's Partial Denial of Reid's Claim

On June 20, 2003, Thomas Messer, a Pekin Property Specialist, drafted a letter which Pekin Claims Adjuster Summer Shanle signed and sent to Reid. Pekin partially denied Reid's claim in the letter. Prior to June 20, 2003, Sandberg had given Messer copies of Balmer's Report and Reid's Notes. Messer knew that the engineer hired by Westbend (i.e., Teasdale of Haag Engineering Company) had concluded that the damage to the Building was not caused by Klocke's demolition activities. Messer was aware of the fact that Westbend had denied coverage of Reid's claim. Sandberg and Riley made an oral

report to Messer prior to June 20, 2003, and they informed Messer that they had concluded that Klocke's demolition activities did not cause damage to the Building. The June 20, 2003 letter, in pertinent part, reads:

> The inspection reports and findings of Classic Consultants LTD and IIW Engineers and Surveyors have concluded that the damage to your [Building] were [sic] not a result of a sudden and accidental nature, relating to the demolition of the foundation of the neighboring property. The findings show evidence of random shrinkage cracks, rotting plywood substrate, absence of a [sic] appropriate window flashings etc. The cost to repair these problems are excluded in your policy, and we are therefore unable to make any payment on them. However, it was found that the vibrations from the excavation could and likely did cause cracking in the taped corners of the rooms that have developed cracks. It is also possible that the vibration could cause the wiring problems you experienced and we would therefore be willing to consider the cost to repair the interior drywall cracks as well as the cost you incurred to repair your electrical and ductwork problems.

Shanle also advised Reid that if she did not provide Pekin with estimates to repair the covered items, Pekin would assume Reid had resolved her concerns directly with Westbend.

On September 25, 2003, Shanle wrote another letter to Reid regarding her claim. In part, it reads:

> We have enclosed a copy of our June 20, 2003 correspondence. The last two paragraphs of the letter state what we are willing to cover and we continue to wait on an estimate for those repairs.

Reid never submitted an estimate before she filed the Complaint.

### H. Inspections After Pekin's Partial Denial of Claim

#### 1. Balmer & Waugh's Report

Reid hired Dennis Waugh, an engineer with IIW Engineers & Surveyors, P.C., in about August of 2003. On August 19, 2003, Waugh conducted an inspection of the Building. Waugh discussed his opinions and findings with his colleague, Balmer. On September 11, 2003, Waugh wrote a letter to Reid which was signed by both him and Balmer ("Balmer & Waugh's Report").

Balmer & Waugh's Report made significant modifications to the opinions Balmer expressed in Balmer's Report, dated May 16, 2003. Balmer & Waugh's Report explains that there are extensive hairline cracks in the concrete block walls of the Building. The report, in part, concludes: "It is our opinion that the extensive fine hairline cracking in the east [concrete block wall] is due primarily to the vibrations from the adjacent demolition work." The report also notes that "the structural integrity of the wall has been severely compromised by the large number of fine hairline cracks that have interrupted the continuity of the walls."

#### 2. Sandberg & Riley

In addition to the original June 9, 2003 inspection, Sandberg and Riley inspected the Building on three subsequent dates—August 20, 2003; September 10, 2003; and October 23, 2003.

On September 18, 2003, Sandberg sent a three-page report ("Riley's September Report") to Shanle at Pekin. Sandberg summarized:

> Our strict opinion relative to Ms. Reid's claim that demolition activities that reportedly took place immediately to the East of [the Building], on or about October 25, 2002, is that such did NOT cause damage to [the Building]. I told Ms. Reid this immediately after our 3.5 Hour Building Inspection on June 9,

> 2003. After two (2) subsequent on-site inspections (8/20 and
> 9/10), and review of copious data, our opinion . . . remains
> the same: no damage from vibration could be found.

(Emphasis in original).

On November 3, 2003, Riley wrote to Sandberg and summarized the four inspections ("Riley's November Report"). He also wrote the following:

> My consistent opinion has been that the building structure and
> its appurtenances exhibit characteristics commensurate with the
> type of construction, care of installation, age and level of
> maintenance; and furthermore that the demolition event of
> October 2002 caused very little, if any, damage or
> amplification of pre-existing conditions. The observed
> structural and cosmetic damage or distress is symptomatic of
> and more patently associated with inadequate design,
> construction, installation and maintenance, without exception.

### 3. Walsh & Kuchma's Report and Supplemental Report

Reid hired KRW Consulting Group, LLC, to inspect the Building. Professional engineers William W. Walsh and Harry B. Kuchma inspected the Building on September 4, 2003, and issued a written report on September 30, 2003 ("Walsh & Kuchma's Report"). Walsh & Kuchma's Report, in part, provides the following opinion: "We believe that much of the observed damage was due to the shock and movement caused by the demolition of the neighboring building's foundation and basement slab."

On January 14, 2006, Walsh and Kuchma provided a Supplemental Report ("Walsh & Kuchma's Supplemental Report"). According to Walsh & Kuchma's Supplemental Report, "the damage . . . to the roof system was extensive. . . . [T]he forces induced into the building from the demolition of the adjacent foundation and basement wall were of sufficient magnitude and duration to cause significant damage to the roof structural system." Walsh and Kuchma conclude that Klocke did not use the appropriate standard

of care when demolishing the adjacent foundation; the number of cracks in the building is rare; and that "this [B]uilding witnessed a highly distressing event."

### 4.     *Teasdale's Second Report*

On November 14, 2003, Teasdale issued a second report ("Teasdale's Second Report") after reviewing Balmer & Waugh's Report and Walsh & Kuchma's Report. Teasdale concluded that "[r]eview of [Balmer & Waugh's Report] and [Walsh & Kuchma's Report] offered no new information which is pertinent to an evaluation of the [B]uilding for shaking damage." Teasdale, in part, stated: "The reports . . . provide no additional information or analysis which would support the belief that the Building was damaged by ground vibrations. . . . [T]he conclusions reached in our August 14, 2003, report are unchanged."

### 5.     *Ashton's Report*

In 2005 and after Reid filed the Complaint, Pekin hired William D. Ashton of Ashton Engineering, Inc., to inspect the Building. He inspected the Building on February 7, 2005, and wrote a report on February 9, 2005 ("Ashton's Report"). Ashton reviewed Riley's July Report, Riley's September Report, Riley's November Report, photographs, Teasdale's Report, Teasdale's Second Report, Balmer's Report, Balmer & Waugh's Report and Walsh & Kuchma's Report. Ashton's Report concludes: "In conclusion, it is my professional opinion that the Klocke construction activities did not generate vibrations sufficient to damage the [Building] and that the claims are caused by environmental stresses, poor design, and/or lack of maintenance."

## IV.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only when the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th

Cir. 2005). An issue of fact is "genuine" if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods*, 409 F.3d at 990 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it is a fact "'that might affect the outcome of the suit under the governing law . . . .'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson*, 477 U.S. at 248). In considering a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus.*, 475 U.S. at 587-88. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* at 587.

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 394 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## V. ANALYSIS OF REID'S BAD FAITH CLAIM

In Count II of the Complaint, Reid claims Pekin acted in bad faith in denying her claim for coverage. In response to the bad faith tort claim, Pekin argues that Reid is not entitled to relief because Pekin had a reasonable basis for partially denying her claim both on and after June 20, 2003. Pekin argues that it partially denied Reid's claim due to the

opinions of three professional engineers, all of whom agreed that Klocke's October 25, 2002 demolition activities did not cause damage to the Building.

### A. *Elements of a Bad Faith Claim*

Iowa common law provides:

> In first-party, bad-faith claims, the plaintiff must show (1) the absence of a reasonable basis for denying the claim, and (2) the insurer knew or had reason to know that its denial was without a reasonable basis.

*Galbraith v. Allied Mut. Ins. Co.*, 698 N.W.2d 325, 328 (Iowa 2005). "The first element is an objective one; the second element is subjective." *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005). A reasonable basis to deny a claim exists when the claim is "fairly debatable." *See Dirks v. Farm Bureau Mut. Ins. Co.*, 465 N.W.2d 857, 861 (Iowa 1991) ("Where a claim is fairly debatable, the insurer is entitled to debate it and there is no bad faith on its part in doing so."); *see also Bellville*, 702 N.W.2d at 473 ("[I]f reasonable minds can differ on the coverage-determining facts or law, then the claim is fairly debatable."). The debate may be regarding an issue of fact or law. *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 396 (Iowa 2001). "An insurance company has the right to debate claims that are 'fairly debatable' without being subject to a bad faith tort claim." *Sampson v. Am. Standard Ins. Co.*, 582 N.W.2d 146, 150 (Iowa 1998).

The issue of whether a claim is "fairly debatable" under the first prong of the bad faith test is a question for the court:

> Whether a claim is fairly debatable can generally be decided as a matter of law by the court. That is because where an objectively reasonable basis for denial of a claim *actually exists*, the insurer cannot be held liable for bad faith as a matter of law.

*Bellville*, 702 N.W.2d at 473 (citations and quotations omitted) (emphasis in original). "The focus is on the existence of a debatable issue, not on which party was correct." *Id.* (citing *Thompson*, 559 N.W.2d at 292). A court "do[es] not weigh the conflicting evidence that was before the insurer; [it] decide[s] whether evidence existed to justify denial of the claim." *Id.* (citing *State Farm Lloyds, Inc. v. Polasek*, 847 S.W.2d 279, 285 (Tex. Ct. App. 1992)).

## B. Reid's Claim was "Fairly Debatable"

### 1. The parties' arguments

Pekin argues that it is entitled to judgment as a matter of law on Reid's bad faith claim because it relied on the opinions of three engineers when it partially denied her claim on June 20, 2003.

Reid responds that there is a genuine issue of material fact as to the objectivity of Pekin's inspectors. She argues that neither Sandberg nor Riley conducted an impartial inspection and that they were working to rid Pekin of her claim. Reid argues that Sandberg's opinion was not objectively reasonable, because he had previously been employed by Pekin for over six years. Reid also argues that Sandberg and Riley conducted only a "cursory" inspection of the Building prior to June 20, 2003, and completely disregarded Balmer & Waugh's Report.[3]

Pekin replies that Sandberg and Riley's opinions are not "unreliable, dishonest or uninformed" because they are supported and corroborated by the opinions in Balmer's Report and Teasdale's Report. Pekin argues that it did not ignore Balmer & Waugh's

---

[3] Reid also relies on the December 15, 2004 opinion of Marshall W. Reavis, III, in her Resistance. The court finds Reavis's six-page opinion immaterial and irrelevant to this Motion insofar as Reavis purports to make the legal conclusion that Pekin acted in bad faith.

Report, but, rather, that it continued to actively investigate Reid's claim long after it initially denied part of Reid's claim on June 20, 2003. Pekin argues that three of Sandberg and Riley's inspections of the Building occurred *after* Balmer & Waugh's Report issued on September 11, 2003. Pekin further argues that it even hired a second professional engineer, Ashton, to inspect the Building and review Balmer & Waugh's Report.

### 2.  June 20, 2003 partial claim denial

On June 9, 2003, Pekin's professionals, Sandberg and Riley, inspected the building and concluded there was no evidence of damage to the building from the demolition activities. These professional opinions, alone, show that Pekin had an objectively reasonable basis for partially denying Reid's claim on June 20, 2003. *See Bellville*, 702 N.W.2d at 475 (noting the fact that plaintiff's experts disagreed with defendant's experts was not evidence showing that the basis of defendants' valuation was unreasonable).

In addition to the professional opinions of Sandberg and Riley, Pekin relied on the opinions of Reid's and Westbend's engineers in partially denying Reid's claim. Messer, the person responsible for investigating and processing Reid's claim on behalf of Pekin, received and read Balmer's Report prior to the June 20, 2003 claim denial. Messer also knew that Westbend's engineer, Teasdale, had concluded that Klocke's demolition activities had not caused damage to the Building. Messer did not have Teasdale's Report prior to the June 20, 2003 partial claim denial, because Teasdale did not write the report until August 14, 2003. Messer did, however, know of Teasdale's conclusion and the fact that Westbend had denied coverage.

Viewing the evidence in the light most favorable to Reid, the court finds that, as a matter of law, Pekin had an objectively reasonable basis for partially denying Reid's claim on June 20, 2003. The claim was fairly debatable because three different engineers had concluded that Klocke's demolition activities did not cause structural or other major

damage to the Building. Given Balmer's Report and the unwritten opinions of Riley and Teasdale, Reid's claim was, at a minimum, fairly debatable. *Id.*

The court rejects Reid's argument that Sandberg and Riley were biased and conducted a cursory inspection. "In a first-party bad faith claim, 'an imperfect investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim.'" *Sampson v. Am. Standard Ins. Co.*, 582 N.W.2d 146, 151 (Iowa 1998) (quoting *Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d 250, 254-55 (Iowa 1991)). Assuming that Sandberg and Riley did, in fact, conduct an imperfect, cursory investigation, their opinions were corroborated by the opinions of two other engineers. Here, Reid's own engineer, Balmer, initially concluded that Klocke's demolition activities caused no damage to the Building. *See* Balmer's Report. A second engineer examined the building on June 3, 2003, and made similar conclusions. *See* Teasdale's Report. This second engineer was working neither for Reid nor Pekin, but, instead, for Westbend, Klocke's liablity insurance carrier. Therefore, even if Pekin had never retained Sandberg and Riley, but instead had relied solely on the opinion of Balmer, Reid's bad faith claim could not survive summary judgment.

### 3.    *Continued denial of claim*

The court also rejects Reid's argument that Pekin acted in bad faith when it continued to deny her claim after receiving Balmer & Waugh's Report in September of 2003. At that time, Pekin was relying on the differing opinions of various professional engineers. The following is a summary of the existing opinions to date:

| Date of Inspection or Review | Inspector(s) | Retained by: | Whether or not Klocke's October 25, 2002 demolition activities caused significant damage to the Building: |
| --- | --- | --- | --- |
| May 7, 2003 | Balmer | Reid | No |
| June 3, 2003 | Teasdale | Westbend | No |
| June 9, 2003 | Sandberg & Riley | Pekin | No |
| August 19, 2003 | Balmer & Waugh | Reid | Yes |
| August 20, 2003 | Sandberg & Riley | Pekin | No |
| September 4, 2003 | Walsh & Kuchma | Reid | Yes |
| September 10, 2003 | Sandberg & Riley | Pekin | No |
| October 23, 2003 | Sandberg & Riley | Pekin | No |
| November 14, 2003 | Teasdale | Westbend | No |
| February 7, 2005 | Ashton | Pekin | No |
| January 14, 2006 | Walsh & Kuchma | Reid | Yes |

The court concludes that reasonable minds would not differ in finding that Reid's claim for coverage was and remains fairly debatable. The lack of consistency in the inspectors' and engineers' opinions illustrates the fact that the claim is fairly debatable. The court finds that there was an objectively reasonable basis for Pekin's denial of Reid's claim for coverage both after the June 9, 2003 inspection and later, after the additional inspections. Because Reid's entitlement to insurance coverage was fairly debatable, Pekin is entitled to summary judgment on Count II.

## VI.  CONCLUSION

For the foregoing reasons, it is hereby **ORDERED**:

(1)     Pekin Insurance Company's Motion for Partial Summary Judgment (docket no. 20) is **GRANTED**;

(2)     The Clerk of Court shall **DISMISS** Count II of the Complaint; and

(3)     The case will proceed to trial on Count I of the Complaint.

**IT IS SO ORDERED.**

**DATED** this 6th day of June, 2006.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA